**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| (1) SANDRA COKER, as Special Administratrix of the Estate of TY RUTLEDGE, deceased,　　)<br>　　　)<br>　　　Plaintiff,　　　　　　　　　　　　　)<br>　　　)<br>v.　　　　　　　　　　　　　　　　　　)<br>　　　)<br>(1) VIC REGALADO, in his official capacity,　)<br>(2) OLAKULE BABARINDE,　　　　　　)<br>(3) BRANDON BLISH,　　　　　　　　)<br>(4) TURN KEY HEALTH CLINICS, LLC,　)<br>　　　)<br>　　　Defendants.　　　　　　　　　　　)　| Case No. 21-cv-00516-GKF-JFJ<br><br>Jury Trial Demanded<br><br>Attorney Lien Claimed |

## COMPLAINT

**COMES NOW**, Sandra Coker ("Plaintiff"), as the Special Administratrix of the Estate of Ty Rutledge ("Mr. Rutledge" or "Ty"), deceased, and for her causes of action against the above-named Defendants, alleges and states the following:

## PARTIES, JURISDICTION AND VENUE

1.  Plaintiff is a citizen of Oklahoma and the duly-appointed Special Administratrix of the Estate of Mr. Rutledge.  Plaintiff was also Mr. Rutledge's mother. The survival causes of action in this matter are based on violations of Mr. Rutledge's rights under the Fourteenth Amendment to the United States Constitution.

2.  Defendant Vic Regalado ("Sheriff Regalado" or "Defendant Regalado") is the Sheriff of Tulsa County, Oklahoma, residing in Tulsa County, Oklahoma and acting under color of State law. Sheriff Regalado is sued purely in his official capacity.  It is well-established, as a matter of Tenth Circuit authority, that a § 1983 claim against a county sheriff in his official capacity "is the same as bringing a suit against the county." *Martinez v. Beggs,* 563 F.3d 1082, 1091 (10th Cir. 2009). *See also Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010); *Bame v. Iron Cnty.,* 566 F. App'x 731,

737 (10th Cir. 2014).  Thus, in suing Sheriff Regalado in his official capacity, Plaintiff has brought

suit against the County/TCSO.  The Tulsa County Sheriff is the "Tulsa County official

responsible for promulgating and enforcing policies for the [Jail], providing medical care to inmates

and detainees, and operating the jail on a daily basis." *Wirtz v. Regalado,* No. 18-CV-0599-GKF-

FHM, 2020 WL 1016445, at *6 (N.D. Okla. Mar. 2, 2020) (citing See 19 Okla. Stat. § 513; *Estate

of Crowell ex rel. Boen v. Bd. of Cty. Comm'rs of Cleveland Cty.,* 237 P.3d 134, 142 (Okla. 2010)).

3.     Defendant Olakule Babarinde ("Cpl. Babarinde"), was, at all times pertinent hereto, an

employee of the Tulsa County Sheriff's Office ("TCSO"), who was, in part, responsible for

overseeing Mr. Rutledge's safety and well-being during the time he was in the custody of TCSO.

At all times pertinent, Cpl. Babarinde was acting within the scope of his employment and under

color of State law. Cpl. Babarinde is being sued in his individual capacity.

4.     Defendant Brandon Blish ("Officer Blish"), was, at all times pertinent hereto, an employee

of the TCSO, who was, in part, responsible for overseeing Mr. Rutledge's safety and well-being

during the time he was in the custody of TCSO. At all times pertinent, Officer Bish was acting

within the scope of his employment and under color of State law. Officer Bish is being sued in his

individual capacity.

5.     Defendant Turn Key Health Clinics, LLC ("Turn Key") is an Oklahoma limited liability

company doing business in Tulsa County, Oklahoma.  Turn Key is a private correctional health

care company that contracts with counties, including, during the pertinent timeframe, Tulsa

County, to provide medical professional staffing, supervision and care in county jails. Turn Key

was at all times relevant hereto responsible, in part, for providing medical services, supervision and

medication to Mr. Rutledge while he was in the custody of the Tulsa County Sheriff's Office

("TCSO").  Turn Key was additionally responsible, in part, for creating, implementing and

maintaining policies, practices and protocols that govern the provision of medical and mental

2

health care to inmates at the Tulsa County Jail, and for training and supervising its employees. Turn Key was, at all times relevant hereto, endowed by Tulsa County with powers or functions governmental in nature, such that Turn Key became an agency or instrumentality of the State and subject to its constitutional limitations.

6.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

7.      The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

8.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## **STATEMENT OF FACTS**

9.      Paragraphs 1-8 are incorporated herein by reference.

10.    Mr. Rutledge was booked into the Tulsa County Jail ("the Jail") on around January 15, 2018.

11.    On information and belief, early on, Mr. Rutledge was threatened by other inmates and placed in the Jail's Segregated Housing Unit, or "SHU".

12.    On information and belief, on at least one occasion, Mr. Rutledge was violently assaulted by other inmates.

13.     Mr. Rutledge was at known to be, and was obviously, mentally ill and depressed and suicidal while housed at the Jail.

14.   On February 5, 2018, while housed in the SHU, Mr. Rutledge sent a kiosk request to TurnKey medical personnel, indicating that there were "voices" in his head and the problem was getting worse. Rutledge further reported that he had stopped taking his psych meds and that he could not sleep.

15.   On February 13, 2018,  while housed in the SHU, Mr. Rutledge submitted a kiosk request to TurnKey medical personnel, reporting that his anxiety was getting worse.

16.   On March 2, 2018, while housed in the SHU, Mr. Rutledge submitted a kiosk request to TurnKey medical personnel, complaining that he was seeing little "green men riding horses" in his cell that that they were keeping him up at night.  He was not seen by a mental health professional in response to this complaint.

17.   On March 8, 2018, Mr. Rutledge informed Detention Officer Michael Linnett that he was "feeling suicidal". He was not placed on suicide precautions.

18.   On March 15, 2018, while housed in the SHU, Mr. Rutledge submitted a kiosk request to TurnKey medical personnel, complaining that he needed his mental health medications "upped." This request was denied for "noncompliance".

19.   On March 17, 2018, while housed in the SHU, Mr. Rutledge submitted a kiosk request to TurnKey medical personnel, complaining that the "voices" he had been hearing were "back."

20.   Despite the complaint of hearing voices, Mr. Rutledge was not seen by the Jail's psychiatrist, and Turn Key employee, Dr. Lewis.

21.   On April 12, 2018, while housed in the SHU, Mr. Rutledge submitted a kiosk request to TurnKey medical personnel, reporting nightmares that kept him up at night.

22.   On April 17, 2018, while housed in the SHU, Mr. Rutledge submitted a kiosk request to TurnKey medical personnel, reporting that the nightmares were not going away and kept him up at night.

4

23.   It does not appear that Mr. Rutledge was seen by any mental health professional in connection with the complaints of continuing nightmares.

24.   On April 25, 2018, Mr. Rutledge complained that he still could not sleep. The kiosk nurse, Nurse Irvin, replied that he could discuss his problems with the Jail's psychiatrist, Dr. Lewis, at his next visit. Mr. Rutledge "appealed", noting that he never sees Dr. Lewis in the SHU. Nurse Irvin "closed" the matter by notifying Mr. Rutledge that he would see Dr. Lewis in 60-90 days.

25.   On May 7, 2018, while housed in the SHU, Mr. Rutledge submitted a kiosk request to TurnKey medical personnel, complaining of *"VOICES IN MY HEAD GETTING LOUDER."*

26.   On May 8, 2018, while housed in the SHU, Mr. Rutledge submitted a kiosk request to TurnKey medical personnel, reporting *"PARANOIA WORSE THAN IT'S BEEN SINCE I BEEN LOCKED UP."* On that same date, Mr. Rutledge complained of depression and that medication was ineffective.

27.   Then, on May 16, 2018, Mr. Rutledge notified TurnKey medical personnel, via the kiosk system, that *"NO ONE HAS COME TO TALK TO ME YET."* On that same date, he sent a second complaint, *"PARANOIA STILL BAD".*

28.   Once again, on May 18, 2018, Mr. Rutledge complained to TurnKey medical personnel: *"NO ONE TALKED TO ME."*

29.   Despite his known serious mental health conditions, including a diagnosis of psychosis and a mood disorder, he was not seen, urgently, by a psychiatrist or any other qualified mental health professional. This was deliberate indifference to a serious and obvious mental health need.

30.   Also on May 18, 2018, Mr. Rutledge reported to TCSO detention staff, through the kiosk system, that a detention officer "grabbed" his buttocks in the shower.  This complaint was never even responded to.

31.    Considering Mr. Rutledge's recent complaints of worsening and uncontrolled paranoia and voices in his head, plus depression, the report of a sexual assault by a jailer was yet another indication Mr. Rutledge was at an increased risk of self-harm. Yet, the complaint was utterly ignored, in deliberate indifference to Mr. Rutledge's serious and obvious mental health needs.

32.    In his condition, Mr. Rutledge should have been placed on suicide watch precautions, including constant video monitoring, removal of bed sheets and garments from his room, frequent visual wellness checks and monitoring by intercom system.

33.    On May 19, 2018, Mr. Rutledge was being housed in the SHU.

34.    Based on his declining state of unaddressed psychosis and bizarre behavior (including a state of paranoia and responding to "voices" in his head), continuing complaints about worsening psychosis, and a known complaint of being sexually assaulted by a male detention officer,   it was known or obvious to the TCSO staff in the SHU, including Cpl. Babarinde and Officer Blish, as well as Turn Key staff on duty, that Mr. Rutledge posed an excessive risk of suicide/self-harm.

35.    At approximately 3:30 p.m. on May 19, Officer Blish and Cpl. Babarinde discovered Mr. Rutledge in his cell.  He was unresponsive and face down with blood on the floor. Mr. Rutledge purportedly had a towel or shirt tied around his neck.  Cpl. Babarinde purportedly removed the towel or shirt from around Mr. Rutledge's neck and blood came out of his mouth. In addition to abrasions on his neck, Mr. Rutledge also had injuries to his scalp, arm and legs. In violation of policy, neither Officer Blish nor Cpl. Babarinde attempted CPR.

36.    In addition, as shown above, medical staff employed by Turn Key, including kiosk nurse Irvin, utterly disregarded Mr. Rutledge's complaints of worsening psychosis, including voices in his head, paranoia and depression, in deliberate indifference to the substantial and obvious risk of harm he posed to himself.

37.    After medical staff arrived, Mr. Rutledge was pronounced dead.

38.    The Medical Examiner later found that the cause of death was "asphyxia due to ligature strangulation."  The Medical Examiner further determined that the circumstances under which the body was found "are most consistent with suicide."

39.    The staff in the SHU, including Cpl. Babarinde and Officer Blish, and responsible Turn Key staff, including kiosk nurse Irvin, were deliberately indifferent to the known or obvious risks of suicide/self-harm to Mr. Rutledge by failing to take adequate measures to protect Mr. Rutledge from the known or obvious risks of serious harm.

40.    In particular, the staff in the SHU, including Cpl. Babarinde and Officer Blish, and responsible Turn Key staff, including kiosk nurse Irvin, failed to, *inter alia*: refer Mr. Rutledge for a mental health assessment, frequently visually monitor Mr. Rutledge; place Mr. Rutledge on suicide watch precautions, remove bed linens and garments from Mr. Rutledge's cell; monitor Mr. Rutledge through use of the intercom system; call medical personnel to provide treatment to Mr. Rutledge.

41.    The deliberate indifference to Mr. Rutledge's health and safety, as described herein, was a proximate cause of his physical and mental pain and suffering, a worsening of his condition, and his death.

42.    The deliberate indifference to Mr. Rutledge's serious medical needs, his mental health and his safety, as summarized *supra*, was in furtherance of and consistent with: (a) policies, customs, and/or practices which TCSO promulgated, created, implemented or possessed responsibility for the continued operation of; and (b) policies, customs, and/or practices which Turn Key promulgated, created, implemented or possessed responsibility for the continued operation of.

43.    There are longstanding, systemic deficiencies in the mental health care, including the failure to protect inmates from self-harm, provided to inmates at the Tulsa County Jail. Both Sheriff Regalado and Former Sheriff Stanley Glanz have long known of these systemic deficiencies

and the substantial risks they pose to inmates like Mr. Rutledge but failed to take reasonable steps to alleviate those deficiencies and risks.

44.     For instance, in 2007, the NCCHC, a corrections health accreditation body, conducted an on-site audit of the Jail's health services program. At the conclusion of the audit, NCCHC auditors reported serious and systemic deficiencies in the care provided to inmates, including failure to perform mental health screenings, failure to fully complete mental health treatment plans, failure to triage sick calls, failure to conduct quality assurance studies, and failure to address health care needs in a timely manner. NCCHC made these findings of deficient care despite Former Sheriff Glanz's/TCSO's efforts to defraud the auditors by concealing information and falsifying medical records and charts.

45.     Former Sheriff Glanz failed to change or improve any health care policies or practices in response to NCCHC's findings.

46.     There is a long-standing failure to secure adequate mental health care, and to properly classify and protect inmates with obvious and serious mental health needs.  For example, in 2009, TCSO was cited by the Oklahoma State Department of Health for violation of the Oklahoma Jail Standards in connection with the suicide death of an inmate with schizophrenia.

47.     In August of 2009, the American Correctional Association ("ACA") conducted a "mock audit" of the Jail.  The ACA's mock audit revealed that the Jail was non-compliant with "mandatory health standards" and "substantial changes" were suggested.  Based on these identified and known "deficiencies" in the health delivery system at the Jail, the Jail Administrator sought input and recommendations from Elizabeth Gondles, Ph.D. ("Dr. Gondles").  Dr. Gondles was associated with the ACA as its medical director or medical liaison. After reviewing pertinent documents, touring the Jail and interviewing medical and correctional personnel, on October 9, 2009, Dr. Gondles generated a Report, entitled "Health Care Delivery Technical Assistance"

8

(hereinafter, "Gondles Report").  The Gondles Report was provided to the Jail Administrator, Michelle Robinette.  As part of her Report, Dr. Gondles identified numerous "issues" with the Jail's health care system, as implemented by the Jail's former medical provider, CHC.  After receiving the Gondles Report, Chief Robinette held a conference -- to discuss the Report -- with the Undersheriff, Administrative Captain and CHC/CHM.

48.     Among the issues identified by Dr. Gondles, as outlined in her Report, were: (a) understaffing of medical personnel due to CHM misreporting the average daily inmate population; (b) deficiencies in "doctor/PA coverage"; (c) a lack of health services oversight and supervision; (d) failure to provide new health staff with formal training; (e) delays in inmates receiving necessary medication; (g) nurses failing to document the delivery of health services; (h) systemic nursing shortages; (h) failure to provide timely health appraisals to inmates; and (i) 313 health-related grievances within the past 12 months.  Dr. Gondles concluded that "[m]any of the health service delivery issues outlined in this report are a result of the lack of understanding of correctional healthcare issues by jail administration and contract oversight and monitoring of the private provider."  Based on her findings, Dr. Gondles "strongly suggest[ed] that the Jail Administrator establish a central Office Bureau of Health Services" to be staffed by a TCSO-employed Health Services Director ("HSD").  According to Dr. Gondles, without such an HSD in place, TCSO could not properly monitor the competency of the Jail's health staff or the adequacy of the health care delivery system.

49.     Nonetheless, TCSO leadership chose not to follow Dr. Gondles' recommendations. TCSO did not establish a central Office Bureau of Health Services nor hire the "HSD" as recommended. Id.

50.     On October 28, 2010, Assistant District Attorney Andrea Wyrick wrote an email to Josh Turley, TCSO's "Risk Manager."  In the email, Ms. Wyrick voiced concerns about whether the

Jail's medical provider, Defendant CHMO, a subsidiary of CHC, was complying with its contract. Ms. Wyrick further made an ominous prognosis: "This is very serious, especially in light of the three cases we have now - what else will be coming? It is one thing to say we have a contract ... to cover medical services, it is another issue to ignore any and all signs we receive of possible [medical] issues or violations of our agreement with [CHC] for [health] services in the jail. The bottom line is, the Sheriff is statutorily obligated to provide medical services."

51.     NCCHC conducted a second audit of the Jail's health services program in 2010. After the audit was completed, the NCCHC placed the Tulsa County Jail on probation.

52.     NCCHC once again found numerous serious deficiencies with the health services program. As part of the final 2010 Report, NCCHC found, inter alia, as follows: "The [Quality Assurance] multidisciplinary committee does not identify problems, implement and monitor corrective action, nor study its effectiveness"; "There have been several inmate deaths in the past year"; The clinical mortality reviews were poorly performed"; "The responsible physician does not document his review of the RN's health assessments"; "the responsible physician does not conduct clinical chart reviews to determine if clinically appropriate care is ordered and implemented by attending health staff"; "diagnostic tests and specialty consultations are not completed in a timely manner and are not ordered by the physician"; "if changes in treatment are indicated, the changes are not implemented"; "When a patient returns from an emergency room, the physician does not see the patient, does not review the ER discharge orders, and does not issue follow-up orders as clinically needed"; and *"potentially suicidal inmates [are not] checked irregularly, not to exceed 15 minutes between checks. Training for custody staff has been limited. Follow up with the suicidal inmate has been poor."*

53.     Former Sheriff Glanz only read the first two or three pages of the 2010 NCCHC Report. Former Sheriff Glanz is unaware of any policies or practices changing at the Jail in response to 2010 NCCHC Report.

54.     Over a period of many years, Tammy Harrington, R.N., former Director of Nursing at the Jail, observed and documented many concerning deficiencies in the delivery of health care services to inmates. The deficiencies observed and documented by Director Harrington include: chronic failure to triage inmates' requests for medical and mental health assistance; a chronic lack of supervision of clinical staff; and repeated failures of medical staff to alleviate known and significant deficiencies in the health services program at the Jail.

55.     On September 29, 2011, the U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") reported its findings in connection with an audit of the Jail's medical system - pertaining to U.S. Immigration and Customs Enforcement ("ICE") detainees -- as follows: "CRCL found a prevailing attitude among clinic staff of indifference"; "Nurses are undertrained. Not documenting or evaluating patients properly."; "Found one case clearly demonstrates a lack of training, perforated appendix due to lack of training and supervision"; "Found *two detainees with clear mental/medical problems that have not seen a doctor.*"; "[Detainee] has not received his medication despite the fact that detainee stated was on meds at intake"; "TCSO medical clinic is using a homegrown system of records that 'fails to utilize what we have learned in the past 20 years".

56.     Director Harrington did not observe any meaningful changes in health care policies or practices at the Jail after the ICE-CRCL Report was issued.

57.     On the contrary, less than 30 days later the ICE-CRCL Report was issued, on October 27, 2011 another inmate, Elliott Earl Williams, died at the Jail as a result of truly inhumane treatment and reckless medical neglect which defies any standard of human decency.  Pertinently, Mr. Williams' injuries resulted from self-harm. A federal jury has since entered a verdict holding Sheriff Regalado liable in his official capacity for the unconstitutional treatment of Mr. Williams.

58.     In the wake of the Williams death, which was fully investigated by TCSO, Former Sheriff Glanz made no meaningful improvements to the medical or mental health system at the Jail. This is evidenced by the fact that yet another inmate, Gregory Brown, died due to grossly deficient care just months after Mr. Williams.

59.     On November 18, 2011 AMS-Roemer, the Jail's own retained medical auditor, issued its Report to Former Sheriff Glanz finding multiple deficiencies with the Jail's medical delivery system, including "[documented] deviations [from protocols which] increase the potential for preventable morbidity and mortality."  AMS-Roemer specifically commented on no less than six (6) inmate deaths, finding deficiencies in the care provided to each.

60.     It is clear that Former Sheriff Glanz did little, if anything, to address the systemic problems identified in the November 2011 AMS-Roemer Report, as AMS-Roemer continued to find serious deficiencies in the delivery of care at the Jail. For instance, as part of a 2012 Corrective Action Review, AMS-Roemer found "[d]elays for medical staff and providers to get access to inmates," "[n]o sense of urgency attitude to see patients, or have patients seen by providers," failure to follow NCCHC guidelines "to get patients to providers," and "[n]ot enough training or supervision of nursing staff."

61.     In February 2013, an inmate, Gwendolyn Young, died at the Jail after TCSO officers and nursing staff failed to adequately care for and supervise her while she was housed in the SHU.

62.     In November 2013, BOCC/TCSO/Former Sheriff Glanz retained Armor Correctional Health Services, Inc. ("Armor") as its private medical provider. However, this step did not alleviate the constitutional deficiencies with the medical system. Medical staff was still undertrained and inadequately supervised and inmates were still denied timely and sufficient medical attention. Bad medical and mental health outcomes persisted due to inadequate supervision and training of medical staff, and due to the contractual relationship between BOCC/TCSO/Former Sheriff

Glanz and ARMOR (which provided financial disincentives for the transfer of inmates in need of care from an outside facility).

63.     In February 2015 an auditor/nurse hired by Tulsa County/TCSO, Angela Mariani, issued a report focused on widespread failures by ARMOR to abide by its $5 million annual contract with the County. Mariani also wrote three (3) memos notifying TCSO that ARMOR failed to staff various medical positions in the Jail and recommending that the county withhold more than $35,000 in payments.  Her report shows that Jail medical staff often failed to respond to inmates' medical needs and that ARMOR failed to employ enough nurses and left top administrative positions unfilled for months. Meanwhile, medical staff did not report serious incidents including inmates receiving the wrong medication and a staff member showing up "under the influence."

64.     On July 18, 2014, inmate Eduardo Torres died by suicide while housed at the Jail. Mr. Torres also hanged himself.

65.     On March 12, 2016, inmate Nathan Bradshaw died by suicide at the Jail.

66.     On October 5, 2016, inmate Catlin Lewis died by suicide at the Jail. Ms. Lewis also hanged herself.

67.     On July 31, 2017, inmate Jimmy Ray Williams died by suicide while housed at the Jail. Mr. Williams also hanged himself.

68.     In 2016, the County/Sheriff Regalado retained Turn Key as the Jail's medical contractor. Turn Key's CEO, Flint Junod, was Armor's Vice President of the Jail's region during Armor's tenure as the Jail's private medical provider and he was aware of deficiencies in the medical care provided at the Jail prior to and at the time Turn Key was retained.

69.     For a time in recent years, Defendant Turn Key was the largest private medical care provider to county jails in the state.  Turn Key used its political connections to obtain contracts in

13

a number of counties, including Tulsa County, Muskogee County, Garfield County and Creek County.

70.     To achieve net profits, Turn Key implemented policies, procedures, customs, or practices to reduce the cost of providing medical and mental health care service in a manner that would maintain or increase its profit margin.

71.     There are no provisions in Turn Key's contract creating or establishing any mandatory minimum expenditure for the provision of Healthcare Services. Turn Key's contract incentivizes cost-cutting measures in the delivery of medical and mental health care service at the Jail to benefit Turn Key's investors in a manner that deprives inmates at the Jail from receiving adequate medical care.

72.     Under the Contract, Turn Key is responsible to pay the costs of all pharmaceuticals at the Jail.  And TCSO/Tulsa County is responsible for the costs of all inmate hospitalizations and off-site medical care.  These contractual provisions create a dual financial incentive to under-prescribe and under-administer medications and to keep inmates, even inmates with serious medical needs, at the Jail to avoid off-site medical costs.

73.     These financial incentives create risks to the health and safety of inmates like Mr. Rutledge who have complex and serious medical needs, such as opioid withdrawal, seizure disorders, mental health issues, and heart disease.

74.     Turn Key has no protocol or clear policy with respect to the medical monitoring and care of inmates with complex or serious medical needs, and provides no guidance to its medical staff regarding the appropriate standards of care with respect to inmates with complex or serious mental health needs, including suicidal inmates.

75.     Specifically, Turn Key has an established practice of failing to adequately assess and treat -- and ignoring and disregarding -- obvious or known symptoms of emergent and life-threatening

14

conditions.

76.     These failures stem from the chronic unavailability of an on-site physician or psychiatrist, financial incentives to avoid the costs of inmate prescription medications and off-site treatment and a failure to train and supervise medical staff in the assessment and care of inmates with complex or serious mental health needs, including suicidal inmates.

77.     Dr. Lewis, Turn Key's psychiatrist, was a "roving" provider, who worked a numerous facilitates.  Thus, as a matter of policy and practice, Dr. Lewis was unavailable most of the time to inmates like Mr. Rutledge with serious psychosis in urgent and emergent need of an assessment. This lack of availability of psychiatrist care constitutes unconstitutional understaffing and inadequate supervision.

78.     Turn Key's inadequate or non-existent policies and customs were a moving force behind the constitutional violations and injuries alleged herein.

79.     Turn Key's corporate policies, practices and customs as described *supra*, have resulted in deaths or negative medical outcomes in numerous cases, in addition to Mr. Rutledge's.

80.     For instance, on May 10, 2016, an inmate housed in the SHU attempted suicide by tying the lower hem of his t-shirt to his neck and bed. Detention Officer Baker was the first to enter the cell and was able to remove the t-shirt from the inmate's neck and laid him on the floor. Once was laid down, he awoke and responded to verbal commands but appeared to be sluggish. The inmate was then transported to medical for further evaluation and observation.

81.     In June 2016, a nurse who worked for Turn Key at the Garfield County Jail allegedly did nothing to intervene while a hallucinating man was kept in a restraint chair for more than 48 hours. That man, Anthony Huff, ultimately died restrained in the chair.

82.     On July 9, 2016, an inmate was booked into the Jail and placed on suicide watch after telling Jail staff he was suicidal. He was placed in a medical unit where he could be monitored by

15

staff. Despite being on suicide watch, this inmate was, upon information and belief, not adequately monitored or supervised by Jail staff, and was able to obtain a material that he used to lacerate veins in his wrists in an apparent suicide attempt. The inmate was found unconscious and bleeding profusely, and was subsequently transferred to the hospital.

83.    On September 8, 2017, a 25-year-old man named Caleb Lee ("Mr. Lee") was booked into the Tulsa County Jail.

84.    During the book-in process, on September 8, Turn Key nurse Jessica Mobley, LPN ("Nurse Mobley"), filled out an Intake Screening form.  Pertinently, the Intake Screening form indicates that Mr. Lee had been treated at a "methadone clinic" just two days prior, on September 6, 2017, the date of his arrest.  During the intake screening process, Nurse Mobley further documented that Mr. Lee: (A) took 140mg of methadone "daily", with his last dose taken "48 hours ago"; (B) had a history of heroin abuse; (C) had used methadone for the preceding three (3) years; (D) suffered from "cardiac disease"; (E) had been admitted for inpatient treatment at a methadone clinic within the previous 2 days; (F) had high blood pressure; (G) was experiencing withdrawal symptoms; (H) had a history of withdrawal seizures; and (I) had previously attempted suicide.

85.    As early as the morning of September 9, 2017, Mr. Lee reported to medical staff (Turn Key nurse Terri Taylor) that he was experiencing hallucinations that were causing him "significant distress or impaired functioning."  Mr. Lee additionally stated to Nurse Taylor that he had been on methadone and had a heavy heroin habit of one gram every night.  Nurse Taylor set a "high priority" appointment for Mr. Lee with a mental health professional.  However, for unknown reasons, that appointment was "deleted" from the schedule by Turn Key psychologist, Alicia Irvin.

86.    Mr. Lee exhibited obvious, documented and serious symptoms of a serious medical condition for days, with his symptoms worsening by the day. On September 12, at around 10:30 p.m., Mr. Lee communicated to Turn Key nurse Casey Combs that he was feeling suicidal.  His

16

hypertension increased to levels of 160/61 and 151/94.

87.     Mr. Lee's obviously severe condition became increasingly worse on a daily basis, and by September 18, he was experiencing intense hallucinations, visible shaking, and psychosis. It was obvious, even to lay security staff, that Mr. Lee was deteriorating.

88.     Despite Mr. Lee's obviously emergent medical and mental health needs, he was never seen by Turn Key physician William Cooper, D.O., who actually cancelled an appointment with Mr. Lee that had been scheduled. Further, no TCSO or Turn Key staff ever recommended that Mr. Lee be transported to an outside medical provider for an evaluation and/or treatment.

89.     On the morning of September 24, 2017, a medical emergency was called by TCSO detention staff due to Mr. Lee's frantic complaints of chest pain and seeming inability to stand or walk.

90.     When EMSA arrived, it was observed that there was a Jail "physician on the scene", believed to be Holly Martin, APRN ("Nurse Practitioner Martin"), but that this "physician on scene" merely stood by Mr. Lee's head and ***did "not offer any treatment help."*** Turn Key/TCSO had no medication available to stop the seizure and Nurse Practitioner Martin provided no assistance to the EMSA personnel in stopping or treating the seizure.

91.     Mr. Lee was taken to OSU Medical Center, where he was pronounced dead at 11:25 a.m. The impression was that Caleb died from a cardiopulmonary arrest with noted gastrointestinal bleeding.

92.     TCSO and the County were on notice that the supervision and care for inmates who pose a substantial risk of self-harm was deficient and posed an unacceptable risk to the health and safety of inmates like Mr. Rutledge.  However, TCSO and the County failed to alleviate the known and obvious risks in deliberate indifference to the rights of inmates like Mr. Rutledge.

93.     Turn Key has maintained a custom of inadequate medical care and staffing at a corporate

17

level which poses excessive risks to the health and safety of inmates like Mr. Rutledge.

94.     In addition, TCSO has utterly failed to train its detention staff in how to properly care for or supervise inmates, like Mr. Rutledge, with complex or serious mental health needs, or who otherwise pose a substantial risk of self-harm, with deliberate indifference to the health and safety of those inmates.

95.     The violation of Mr. Rutledge's Constitutional rights was a highly predictable consequence of TCSO and/or Turn Key's failure to train and/or supervise staff with respect to the care, assessment, monitoring and precautions necessary to address the recurring situation of inmates who pose a substantial risk of self-harm or harm from other inmates.

96.     This specific failure to train and/or supervise staff was a proximate cause of -- or moving force behind -- the violation of Mr. Rutledge's Constitutional rights.

97.     TCSO's failure to train and supervise Jail staff was admitted in 2018, by the TCSO Jail Administrator, who sent an email to Jail supervisors concerning Jail staff's many failures, in which he concludes: "What I see now is either people don't have the abilities to complete or excel in their positions which means we as a whole have failed. We either didn't train them, we didn't challenge them, we didn't hold them accountable (which doesn't always mean discipline)...."

## ABSENCE OF FEDERALISM BAR TO
## *MONELL* CLAIM AGAINST TURN KEY

98.     The federalism concern that compelled the *Monell* Court to erect a bar against *respondeat superior* liability for § 1983 claims against municipal entities has no application to Turn Key, a private entity. *See e.g.*, *Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 795 (7th Cir. 2014) ("[A] new approach may be needed for whether corporations should be insulated from *respondeat superior* liability under § 1983.").

18

## CAUSES OF ACTION

## VIOLATION OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
### (42 U.S.C. § 1983)

99.    Paragraphs 1-98 are incorporated herein by reference.

**A.    Underlying Violations of Constitutional Rights/Individual Liability**

100.    The TCSO/Turn Key staff, including Cpl. Babarinde, Officer Blish and kiosk nurse Irvin, as described above, knew, or it was obvious that, there was a strong likelihood that Mr. Rutledge was in danger of serious harm.

101.  As described *supra*, the staff in the SHU, including Cpl. Babarinde and Officer Blish, and responsible Turn Key staff, including kiosk nurse Irvin, were deliberately indifferent to the known or obvious risks of suicide/self-harm to Mr. Rutledge by failing to take adequate measures to protect Mr. Rutledge from the known or obvious risks of serious harm.

102. In particular, the staff in the SHU, including Cpl. Babarinde and Officer Blish, and responsible Turn Key staff, including kiosk nurse Irvin, failed to, *inter alia*: refer Mr. Rutledge for a mental health assessment, frequently visually monitor Mr. Rutledge; place Mr. Rutledge on suicide watch precautions, remove bed linens and garments from Mr. Rutledge's cell; monitor Mr. Rutledge through use of the intercom system; call medical personnel to provide treatment to Mr. Rutledge.

103.  The deliberate indifference to Mr. Rutledge's health and safety, as described herein, was a proximate cause of his physical and mental pain and suffering, a worsening of his condition and his death.

104.  On information and belief, the deliberate indifference to Mr. Rutledge's health and safety, as described herein, was a proximate cause of his physical unnecessary physical pain, a worsening

of his condition, severe emotional distress, mental anguish, lost wages, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment, medical expenses, and death.

105.     As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to pecuniary and compensatory damages. Plaintiff is entitled to damages due to the deprivation of Mr. Rutledge's rights secured by the U.S. Constitution, including punitive damages.

### B.   Official Capacity Liability (Against Sheriff Regalado)

106.     Paragraphs 1-105 are incorporated herein by reference.

107.     The aforementioned acts and/or omissions of TCSO and/or Turn Key staff in being deliberately indifferent to Mr. Rutledge's health and safety and violating Mr. Rutledge's civil rights are causally connected with customs, practices, and policies which the County/TCSO promulgated, created, implemented and/or possessed responsibility for.

108.     Such policies, customs and/or practices are specifically set forth in paragraphs 42-93, *supra*.

109.     The County/TCSO, through its continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices; in spite of their known and obvious inadequacies and dangers; has been deliberately indifferent (as that standard is defined for municipalities) to inmates', including Mr. Rutledge's, health and safety.

110.     As a direct and proximate result of the aforementioned customs, policies, and/or practices, Mr. Rutledge suffered injuries and damages as alleged herein.

### C.   Municipal/"Monell" Liability (Against Turn Key)[1]

---

[1]     "A municipal entity may be liable where its policy is the moving force behind the denial of a constitutional right, *see Monell* [*v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1977), 98 S.Ct. 2018], *or* for an action by an authority with final policy making authority, *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 482–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)." *Revilla v. Glanz,*

111.    Paragraphs 1-110 are incorporated herein by reference.

112.    Turn Key is a "person" for purposes of 42 U.S.C. § 1983.[2]

113.    At all times pertinent hereto, Turn Key was acting under color of State law.

114.    Turn Key has been endowed by Tulsa County with powers or functions governmental in nature, such that Turn Key became an instrumentality of the State and subject to its constitutional limitations.

115.    Turn Key is charged with implementing and assisting in developing the policies of TCSO with respect to the medical and mental health care of inmates at the Tulsa County Jail and has shared responsibility to adequately train and supervise its employees.

116.    In addition, Turn Key implements, maintains and imposes its own corporate policies, practices, protocols and customs at the Jail.

117.    There is an affirmative causal link between the aforementioned acts and/or omissions of Turn Key medical staff, as described above, in being deliberately indifferent to Mr. Rutledge's serious medical needs, health, and safety, and the above-described customs, policies, and/or practices carried out by Turn Key (*See, e.g.*, ¶¶ 64-97, *supra*).

118.    Turn Key knew or should have known, either through actual or constructive knowledge, or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Mr. Rutledge.  Nevertheless, Turn Key failed to take reasonable steps to

---

8 F. Supp. 3d 1336, 1339 (N.D. Okla. 2014) (emphasis added). Plaintiff's municipal liability claim in this action is based upon a *Monell* theory of liability, thus he need not establish that Turn Key had final policymaking authority for Tulsa County.

[2]      "Although the Supreme Court's interpretation of § 1983 in *Monell* applied to municipal governments and not to private entities acting under color of state law, case law from [the Tenth Circuit] and other circuits *has extended the Monell doctrine to private § 1983 defendants." Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1216 (10th Cir. 2003) (citations omitted) (emphasis added). *See also Smedley v. Corr. Corp. of Am.,* 175 F. App'x 943, 946 (10th Cir. 2005).

alleviate those risks, in deliberate indifference to inmates', including Mr. Rutledge's, serious medical needs.

119.   Turn Key tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

120.   There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Mr. Rutledge's injuries and damages as alleged herein.

121.   Turn Key is also vicariously liable for the deliberate indifference of its employees and agents.

**WHEREFORE,** based on the foregoing, Plaintiff prays this Court grant the relief sought, including but not limited to actual and compensatory damages, and punitive damages, in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

**SMOLEN & ROYTMAN**

/s/Robert M. Blakemore
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
701 S. Cincinnati Avenue
Tulsa, Oklahoma 74119
danielsmolen@ssrok.com
bobblakemore@ssrok.com
(918) 585-2667 P
(918) 585-2669 F

***Attorneys for Plaintiff***