## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SANDRA COKER, as special administrator )<br>of the Estate of TY RUTLEDGE, deceased, )<br> )<br> Plaintiff, )<br> )<br>v. )<br> )<br>VIC REGALADO, in his official capacity, )<br>OLAKULE BABARINDE, )<br>BRANDON BLISH, )<br>TURN KEY HEALTH CLINICS, LLC, )<br> )<br> Defendants. ) | Case No. 21-cv-00516-GKF-JFJ |

---

## DEFENDANT TURN KEY HEALTH CLINICS, LLC'S
## MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

---

Respectfully submitted,

**Jo Lynn Jeter**, OBA #20252
**W. Caleb Jones,** OBA #33541
**Norman Wohlgemuth, LLP**
3200 Mid-Continent Tower
401 S. Boston Ave.
Tulsa, OK 74103

**ATTORNEYS FOR DEFENDANT,
TURN KEY HEALTH CLINICS, LLC**

**July 28, 2022**

TABLE OF CONTENTS

**INTRODUCTION**......................................................................................................1

**STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF")**.......................2

**ARGUMENT AND AUTHORITIES**......................................................................9

    **I.   Applicable Legal Standards.** ......................................................................9

        A.   Summary Judgment Standards. ..........................................................9

        B.   Legal Standards governing Plaintiff's §1983 claim. ..........................10

    **II.  Turn Key was not deliberately indifferent with respect to Ty Rutledge.** ............11

        A.   Turn Key maintained a full-time psychiatrist, psychologist, and physician at the Jail during the entire period of Mr. Rutledge's incarceration. .........................11

        B.   Mr. Rutledge was regularly seen by Turn Key mental health professionals until the date of his death. ....................................................13

        C.   Plaintiff cannot demonstrate that Turn Key was on notice that its policies regarding the care of suicidal inmates were deficient. ...........................14

    **III. Turn Key is entitled to its attorneys' fees and costs incurred in connection with this motion pursuant to 28 U.S.C. §1927 and the Court's inherent authority.** ..................................................................15

**CONCLUSION** ....................................................................................................16

**EXHIBITS**

    Exhibit 1: Affidavit of Dr. William Cooper

    Exhibit 2: Booking Sheet for Ty Rutledge

    Exhibit 3: Time Detail Reports for Dr. Jawaun Lewis, D.O.

    Exhibit 4: Summary Chart of Time Detail Reports for Dr. Jawaun Lewis

    Exhibit 5: Time Detail Reports for Dr. Alicia Irvin

    Exhibit 6: Summary Chart of Time Detail Reports for Dr. Irvin

    Exhibit 7: Time Detail Reports for Drs. William Cooper and Kimberly Lemons

<u>Exhibit 8</u>: Summary Chart of Time Detail Reports for Drs. Cooper and Lemons

<u>Exhibit 9</u>: Turn Key Medical Chart for Ty Rutledge

<u>Exhibit 10</u>: Kiosk Message Log

<u>Exhibit 11</u>: Excerpts from deposition of Dr. Jawaun Lewis taken by Plaintiff's counsel on May 21, 2021 in *Lee v. Turn Key, et al.*, No. 19-CV-318-GKF

<u>Exhibit 12</u>: October 22, 2020 correspondence from undersigned counsel to Plaintiff's law firm providing, at Plaintiff's law firm's request, Turn Key's medical chart for Ty Rutledge

## TABLE OF AUTHORITIES

<u>**CASES**</u>

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)......................................................................................................10

*Barney v. Pulsipher,*
    143 F.3d 1299 (10th Cir. 1998) ........................................................................ 11, 14-15

*Bond v. Regalado,*
    No. 18-CV-231-GKF (N.D. Okla. Sep. 30, 2021)............................................................16

*Brown v. Chaffee*,
    612 F.2d 4997 (10th Cir. 1979) ....................................................................................10

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986).........................................................................................................9

*Chambers v. NASCO, Inc.,*
    501 U.S. 32 (1991).......................................................................................................17

*Coffey v. McKinley Cty.,*
    504 F. App'x 715 (10th Cir. 2012) ...........................................................................11, 15

*Crowson v. Washington Cnty.*
    983 F.3d 1166 (10th Cir. 2020) ................................................................................10, 11

*Johnson v. Davis Cnty,*
    2022 U.S. App. LEXIS 7626 (10th Cir. Mar. 21, 2022).............................................11, 15

*Lee v. Turn Key, et al.,*
    No. 19-CV-318-GKF (N.D. Okla. Mar. 19, 2020) ..........................................................13

*Miller v. United States*,
    710 F.2d 656 (10th Cir. 1983) ......................................................................................10

*Morganroth & Morganroth v. DeLorean,*
    213 F.3d 1301 (10th Cir. 2000) ................................................................................. 16-17

*Quinn v. Syracuse Model Neighborhood Corp.,*
    613 F.2d 438 (2d Cir. 1980)...........................................................................................10

*Scott v. Harris,*
    550 U.S. 372 (2007).................................................................................................10, 17

*Waller v. City & Cnty. Of Denver,*
    932 F.3d 1277 (10th Cir. 2019) .................................................................................11, 15

*Weir v Anaconda Co.*
    773 F.3d 1073 (10th Cir. 1985) ................................................................................. 9-10

## STATUTES

28 U.S.C. § 1927...................................................................................................................15, 16

42 U.S.C. § 1983.................................................................................................................. Passim

## COURT RULES

Fed. R. Civ. P. 56....................................................................................................................1, 9

Pursuant to Fed. R. Civ. P. 56, Defendant, Turn Key Health Clinics, LLC, respectfully moves for summary judgment on Plaintiff's remaining §1983 claim, and for an award of fees and costs. The undisputed facts establish that Ty Rutledge's constitutional rights were not violated and that any alleged deficiency in Mr. Rutledge's care is not attributable to any unconstitutional practice or policy of Turn Key. In support of this motion, Turn Key states as follows:

## INTRODUCTION

This case arises from the suicide of Ty Rutledge, which occurred on May 19, 2018 while Mr. Rutledge was incarcerated in the Tulsa County Jail.  Plaintiff, Sandra Coker as Special Administrator of Rutledge's estate, has alleged various §1983 claims against Turn Key and Sheriff Regalado. On July 8, 2022, however, this Court dismissed all of Plaintiff's §1983 claims, with the sole exception of the claim **"premised on a theory of chronic unavailability of, or lack of access to, an on-site physician or psychiatrist."** (Doc. 34, p. 32).

As detailed by this Court, Plaintiff's remaining claim rests upon three distinct allegations: (1) that Turn Key's Psychiatrist within the Tulsa County Jail, Dr. Jawaun Lewis, was "roving" and therefore, "unavailable most of the time to inmates like Mr. Rutledge with serious psychosis;" (2) that "Mr. Rutledge submitted ten kiosk requests… from March 2, 2018 to May 18, 2018" yet "was not seen by a mental health care provider for over two months"; and (3) that there were two prior incidents of suicide within the Tulsa County Jail "during the years 2016 and 2017" and that, "in 2016, another Jail inmate attempted suicide" in a similar manner to Mr. Rutledge. (Doc. 34, pp. 27-28).  On the strength of these three specific allegations, this Court held that it could "reasonably infer that Turn Key was on notice that the care for inmates who pose a substantial risk of self-harm was deficient and posed an unacceptable risk to their health and safety due to the chronic unavailability of an on-site physician or psychiatrist, but failed to alleviate the risk—i.e. deliberate indifference." (Doc. 34, p. 28).

1

Each of these three allegations is demonstrably *false*:  (1) Turn Key's psychiatrist within the Tulsa County Jail was not "roving"— he worked full-time within the Tulsa County Jail during the entire period of Ty Rutledge's incarceration, working on-site approximately 47 hours per week and, on average, 27 days per month during this time period; (2) Mr. Rutledge did not go two months without seeing a mental health provider— he was cared for consistently by licensed mental health professionals, and he was seen by mental health providers, including Dr. Lewis and psychologist Dr. Alicia Irvin, six times in the two months preceding his suicide; and (3) only one suicide occurred within the Tulsa County Jail under Turn Key's care, which is insufficient as a matter of law to provide notice.

The undisputed evidence establishes that Turn Key is entitled to summary judgment on Plaintiff's remaining claim.  The defendants and this Court should not expend months, if not years, of resources in needless litigation over Plaintiff's baseless and falsely pled §1983 claim.

## STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF")

1.      Turn Key became the contracted medical provider for the Tulsa County Jail on December 1, 2016. (Exh. 1, Affidavit of Dr. William Cooper, D.O., ¶ 4).

2.      Ty Rutledge was arrested on January 15, 2018, and he remained incarcerated in the Tulsa County Jail until his death on May 19, 2018. (Exh. 2, Booking Sheet for Ty Rutledge).

3.      Between December 1, 2016 (the date Turn Key become the Jail's medical provider) and May 19, 2018 (the date of Mr. Rutledge's death), there was one other inmate suicide within the Tulsa County Jail, which occurred on July 31, 2017. (Exh. 1, ¶ 5).

4.      From the months of January 2018 through May 2018 (the months Mr. Rutledge was incarcerated), Dr. Jawaun Lewis, D.O., Turn Key's Psychiatrist, was a full-time employee within the Tulsa County Jail. (Exh. 3, Time Detail Reports for Dr. Jawaun Lewis, D.O.; Exh. 4, Summary

Chart generated from Time Detail Reports for Dr. Jawaun Lewis, D.O.; *see also* Exh. 1, Affidavit of Dr. Cooper, ¶¶ 6, 7, 10). The table below is based on the referenced evidence and depicts Dr. Lewis' days and hours worked at the Tulsa County Jail over this time period in 2018:

| Month | Days Worked | Hours | Average Hours per Week |
|-------|-------------|-------|------------------------|
| January | 29 | 199.98 | 45.16 |
| February | 26 | 204.77 | 51.19 |
| March | 28 | 210.89 | 47.62 |
| April | 25 | 183.93 | 42.92 |
| May | 25 | 206.6 | 46.65 |

5.      From the months of January 2018 through May 2018, Dr. Alicia Irvin, PhD, Turn Key's Psychologist, was a full-time employee within the Tulsa County Jail. (Exh. 5, Time Detail Reports for Dr. Alicia Irvin, PhD; Exh. 6, Summary Chart generated from Time Detail Reports for Dr. Alicia Irvin, PhD; *see also* Exh. 1, Affidavit of Dr. Cooper, ¶¶ 6, 8, 10).  The table below is based on the referenced evidence and depicts Dr. Irvin's days and hours worked at the Tulsa County Jail over this time period in 2018:

| Month | Days Worked | Hours | Average Hours per Week |
|-------|-------------|-------|------------------------|
| January | 23 | 156.63 | 35.37 |
| February | 26 | 158.97 | 39.74 |
| March | 23 | 156.94 | 35.44 |
| April | 27 | 176.57 | 41.2 |
| May | 24 | 181.04 | 40.88 |

6.      From the months of January 2018 through May 2018, Dr. Kimberly Lemons, D.O., Turn Key's on-site physician, and Dr. William Cooper, D.O., Turn Key's Chief Medical Officer, both acted as physicians within the Tulsa County Jail.[1] (Exh. 7, Time Detail Reports for Dr. Kimberly Lemons and Dr. William Cooper; Exh. 8, Summary Chart generated from Time Detail Reports for Dr. Cooper and Dr. Lemons; *see also* Exh. 1, Affidavit of Dr. Cooper, ¶¶ 6, 9, 10). The

---

[1] Plaintiff does not contend that Mr. Rutledge suffered from any untreated medical condition or ever sought referral to a physician. The staffing at issue in this case is that of mental health providers Dr. Lewis and Dr. Irvin.

table below is based on the referenced evidence and depicts Dr. Cooper's and Dr. Lemons' combined days and hours worked at the Tulsa County Jail over this time period in 2018:

| Month | Days Worked | Hours | Average Hours per Week |
|-------|-------------|-------|------------------------|
| January | 17 | 168.6 | 38.07 |
| February | 19 | 180.89 | 45.22 |
| March | 18 | 160.5 | 36.24 |
| April | 18 | 130.77 | 30.51 |
| May | 19 | 164.61 | 37.17 |

7.      Ty Rutledge was first seen by Turn Key staff for a medical and mental health intake screening on January 15, 2018. (Exh. 9, Turn Key Medical Records, pp. 1-6).

8.      Mr. Rutledge stated that he was not on any medications for depression, psychosis, or other mental health conditions. (Exh. 9, p. 4). He had been hospitalized for depression at the age of 13, and he did not present with any signs of recent suicide attempts or self-harm. (Exh. 9, pp. 4-5). Mr. Rutledge also answered in the negative to the following questions:

- Are you currently thinking of killing or hurting yourself? [No]

- Do you feel there is nothing to look forward to in your future? [No]

- Prior to your arrest, were you extremely depressed, or have little interest or pleasure in things that used to bring you joy? [No]

(Exh. 9, p. 4).

9.      Mr. Rutledge stated that he was currently hearing voices during his mental health evaluation and also stated that he was feeling paranoid. (Exh. 9, p. 4).

10.     Mr. Rutledge was placed on suicide watch following his intake screening on January 15, 2018. (Exh. 9, at p. 6).

11.     Mr. Rutledge was removed from suicide watch after evaluation by Licensed Professional Counselor ("LPC") Rob True on January 16, 2018 and subsequently moved to segregated housing on the instruction of detention staff. (Exh. 9, pp. 19-20).

4

12. Mr. Rutledge would remain in segregated housing from January 16, 2018 to February 26, 2018. During this time period, Mr. Rutledge was seen daily by Turn Key staff on restrictive housing rounds. Mr. Rutledge was seen 21 times by LPN Carson Pauley; four times by CMA Lauren Dearman; twice by LPN Nicholas Groom, CMA Jacqueline Wilson, and CMA Jennifer Rhinehart; and once by LPN Kristina Craghead. (Exh. 9, pp. 20-39).

13. Additionally, from January 16, 2018 to February 26, 2018, Mr. Rutledge was visited weekly by Turn Key mental health professionals on mental health rounds. Mr. Rutledge was evaluated by LPC Rob True on January 16, 2018 (Exh. 9, p. 20); by LPC John Fox on February 3, 2018 (Exh. 9, p. 31); and by Psychologist, Dr. Alicia Irvin, on January 18, 2018, January 26, 2018, and February 9, 2018 (Exh. 9, pp. 21, 25, and 33). On two occasions Dr. Irvin attempted to make contact with Mr. Rutledge, but found him asleep in his cell. (Exh. 9, pp. 36, 38). Mr. Rutledge never exhibited or reported any signs or symptoms of suicidal ideation and consistently denied any acute mental health issues during these visits. (Exh. 9, pp. 21, 25, 31, 33, 36, and 38).

14. On January 19, 2018, Mr. Rutledge informed APRN James Constanzer that he was bipolar and had a history of Zoloft and Seroquel use. (Exh. 9, p. 89). Constanzer referred Mr. Rutledge to Psychiatrist Dr. Jawaun Lewis. (*Id.*).

15. Dr. Lewis visited with Mr. Rutledge on January 21, 2018. (Exh. 9, pp. 22-24). Rutledge reported audio and visual hallucinations and feeling irritable and paranoid; Rutledge further reported a previous diagnosis of paranoid schizophrenia, bipolar disorder, and anxiety. (Exh. 9, p. 22). In response, Dr. Lewis started Mr. Rutledge on mental health medications, Sertraline (Zoloft) and Olanzapine (Zyprexa), and planned to follow-up in 90 days. (Exh. 9, pp. 23-24).

16.     Mr. Rutledge underwent a "History and Physical" examination by RN Kim Stout on January 29, 2018. (Exh. 9, pp. 26-30). Mr. Rutledge denied ever trying to commit suicide in the past and denied any suicidal ideation, and his mental condition was noted to be unremarkable. (Exh. 9, p. 28). Mr. Rutledge requested a mental health referral, which was made. (Exh. 9, p. 30). Mr. Rutledge was already being seen weekly by mental health professionals. (*See* SUMF, ¶ 7).

17.      Mr. Rutledge was taken off of his mental health medications on February 5, 2018 because he had not been regularly taking his medications. (Exh. 9, pp. 70-71).

18.     On February 6, 2018, Dr. Irvin set a task for Dr. Lewis noting that Mr. Rutledge requested an appointment. (Exh. 9, p. 93). Dr. Lewis prescribed Paroxetine (Paxil) to Mr. Rutledge on this date. (Exh. 9, p. 72).

19.     On February 9, 2018, Mr. Rutledge told Dr. Irvin that he was "doing much better" since his medication change. (Exh. 9, p. 33).

20.     Dr. Lewis visited with Mr. Rutledge on February 9, 2018. (Exh. 9, pp. 33-35). Mr. Rutledge reported that he was still hearing things and would like something to help. (Exh. 9, p. 33). Mr. Rutledge denied any suicidal ideations and denied having visual hallucinations. (Exh. 9, pp. 33-34). Dr. Lewis prescribed Aripiprazole (Abilify) to Mr. Rutledge, in addition to the already prescribed Paroxetine. (Exh. 9, p. 34).

21.     On March 2, 2018, Mr. Rutledge sent a kiosk message complaining of green men riding horses keeping him up at night. (Exh. 10, Kiosk Message Log, p. 6). A task was set for Dr. Lewis by LPN Martha Sloan, stating Rutledge had requested to be put back on Zoloft because he was having too much anxiety without it. (Exh. 9, p. 95). Dr. Lewis denied this request because Mr. Rutledge had been non-compliant with Zoloft. (*Id*.). Mr. Rutledge had previously reported that "he was not taking medicine before because he did not like the way it made him feel." (Exh. 9, p. 93).

22.     On March 8, 2018, Dr. Irvin conducted a "suicide precaution encounter" with Mr. Rutledge (Exh. 9, p. 40), presumably after Mr. Rutledge reported to detention officer Michael Linnett that he was "feeling suicidal." (Doc. 3, ¶ 17). Mr. Rutledge reported to Dr. Irvin that he was "having trouble on the pod" and wanted protective custody. (Exh. 9, p. 40). He stated "he only said he was suicidal to get moved" and specifically denied any suicidal ideations or plans to commit suicide and denied any other mental health issues. (*Id.*).[2]

23.     As requested, Mr. Rutledge was placed in protective custody, i.e. segregated housing on March 8, 2018. (Exh. 9, p. 40). Mr. Rutledge would remain in protective custody until his death on May 19, 2018. (Exh. 9, pp. 40-65).

24.     While in protective custody, Mr. Rutledge was seen daily on restrictive housing rounds by Turn Key staff. (Exh. 9, pp. 41-64). Mr. Rutledge was seen 46 times by LPN Carson Pauley, nine times by CMA Kara Few, six times by CMA Autumn Hall, five times by LPN Nicholas Groom, and one time by each LPN Paula Hickman, CMA Maureen McAnally, and LPN Sarah Moran. (*Id.*).

25.     In addition, while in protective custody, Turn Key mental health professionals visited Mr. Rutledge on a weekly basis as they conducted mental health rounds. Mr. Rutledge was seen by Dr. Irvin on March 8, March 13, March 23, April 20, and May 3, 2018. (Exh. 9, pp. 41, 42-43, 46-47, 55-56, 58-59). Mr. Rutledge was seen by LPC Terri Taylor on March 30 and April 6, 2018. (Exh. 9, pp. 49, 51). In addition to these visits, mental health professionals, including Dr.

---

[2] Plaintiff's counsel requested and were provided Mr. Rutledge's medical records in October 2020. (*See* Exh. 12, October 22, 2020 correspondence from undersigned counsel to Plaintiff's law firm providing, at Plaintiff's law firm's request, Turn Key's medical chart for Ty Rutledge). Yet, Plaintiff omits the details of this encounter from her Complaint, noting, instead, only that Mr. Rutledge "was not placed on suicide precautions." (Doc. 3, ¶ 17).

Irvin, attempted to make contact with Mr. Rutledge on four other occasions, but found him either out of cell or asleep. (Exh. 9, pp. 53, 57, 61, 63).

26.     On March 14, 2018, Mr. Rutledge sent a kiosk message: "Need meds upped."  Dr. Irvin wrote back, informing Mr. Rutledge that Dr. Lewis would have to see him again before his medications can be changed, due to Mr. Rutledge's previous non-compliance. (Exh. 10, p. 8).

27.     On March 22, 2018, Dr. Lewis, Turn Key Psychiatrist, again visited with Mr. Rutledge.[3] (Exh. 9, pp. 44-46). At the time of this visit, Mr. Rutledge had been prescribed 30 milligrams of Paroxetine (Paxil) and 10 milligrams of Aripiprazole (Abilify) daily. (Exh. 9, p. 44). Dr. Lewis noted that Mr. Rutledge was cooperative, calm, alert, pleasant and exhibited appropriate affect. (Exh. 9, p. 45). Mr. Rutledge denied hallucinations within the past 90 days and denied suicidal ideations. (*Id*.). Dr. Lewis noted that Mr. Rutledge had experienced a decline in adaptive functioning and increased Mr. Rutledge's Aripiprazole prescription to 15 milligrams. (Exh. 9, p. 46). Dr. Lewis planned to follow up with Mr. Rutledge in 90 days. (*Id*.).

28.     On April 4, 2018, Mr. Rutledge sent a kiosk message reading: "Keep having nightmares that wake me up at night." (Exh. 10, p. 11). Dr. Irvin set a task for Dr. Lewis to address the complaint of nightmares on April 6, 2018. (Exh. 9, p. 97).

29.     On April 9, 2018, Dr. Lewis prescribed Terazosin to Mr. Rutledge to address his complaint of nightmares. (Exh. 9, p. 76).

30.     On April 12, 2018, Mr. Rutledge again complained of nightmares. (Exh. 10, p. 11). Dr. Irvin notified Dr. Lewis of Mr. Rutledge's complaint on April 13, 2018, and Dr. Lewis increased Mr. Rutledge's dosage of Terazosin to 2 milligrams. (Exh. 9, pp. 76-77).

---

[3] Despite having possession of Mr. Rutledge's medical records (*see* Exh. 12), Plaintiff omits this visit with Dr. Lewis from her Complaint and, instead, falsely alleges that "Mr. Rutledge was not seen by…Dr. Lewis" following his March 17, 2018 complaint of hearing voices. (Doc. 3, ¶ 20).

31.     On April 17, 2018, Mr. Rutledge sent a kiosk message to Turn Key complaining of nightmares again. Dr. Irvin responded, informing Mr. Rutledge that he had already been prescribed the maximum dose of Terazosin. (Exh. 10, p. 12).

32.     Dr. Irvin set a task for Dr. Lewis to review Mr. Rutledge's medications on May 3, 2018, after Mr. Rutledge had reported an increase in anxiety to her during mental health rounds. (Exh. 9, pp. 58-59, 101). In response, Dr. Lewis increased Mr. Rutledge's dosage of anxiety medication, Paroxetine, from 30 milligrams to 40 milligrams. (Exh. 9, p. 74).

33.     On May 18, 2018, Mr. Rutledge was seen by RN Jesse Misthaven in the Jail's medical unit, after having fallen down in his cell. Mr. Rutledge was noted to have a small area of swelling and bruising on his forehead; he was alert and oriented to time, place, and self. No other complaints were noted. (Exh. 9, p. 105).

34.     On May 19, 2018, Mr. Rutledge was found unresponsive in his cell with a shirt tied tightly around his neck; Mr. Rutledge was without a pulse or respirations. Attempts at resuscitation were unsuccessful, and Mr. Rutledge was pronounced deceased at 4:04 pm. (Exh. 9, pp. 64-65).

## ARGUMENT AND AUTHORITIES

I.     **Applicable Legal Standards.**

A.     Summary Judgment Standards.

Summary judgment shall be granted where the undisputed material facts establish that one party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "There is no requirement in Rule 56, Fed. R. Civ. P., that summary judgment not be entered until discovery is complete" *Weir v. Anaconda Co.*, 773 F.3d 1073 (10th Cir. 1985) (citing *Brown v. Chaffee*, 612 F.2d 497, 504 (10th Cir. 1979); *Miller v. United States*, 710 F.2d 656, 666 (10th Cir. 1983)).   Indeed, "Summary Judgment is a useful device for unmasking

frivolous claims and putting swift end to meritless litigation." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438 (2d Cir. 1980).

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986)). Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

B. <u>Legal Standards governing Plaintiff's §1983 claim.</u>

Plaintiff has not brought a §1983 claim against any individual Turn Key employee, and this Court has found that Plaintiff's allegations do not establish deliberate indifference on the part of any individual employee of Turn Key. (Doc. 34, p. 24). Plaintiff relies instead upon a theory that multiple members of Turn Key staff violated Mr. Rutledge's constitutional rights while acting under a Turn Key policy of staffing the Jail with only a "roving" psychiatrist and physician who were "unavailable most of the time" to inmates like Mr. Rutledge. (Doc. 3, ¶¶ 76-77; Doc. 34, p. 28). This is Plaintiff's sole remaining claim. (Doc. 34, pp. 28-29, 32).

The Tenth Circuit Court of Appeals has characterized this type of claim as a "limited" species of a §1983 municipal liability claim, which exists "where the alleged violation occurred as a result of multiple officials' actions or inactions." *Crowson v. Washington Cnty.*, 983 F.3d 1166, 1191 (10th Cir. 2020). "[W]here the acts or omissions of no one employee may violate an individual's constitutional rights, the combined acts or omissions of several employees acting

under a governmental policy or custom may violate an individual's constitutional rights."
*Crowson,* 983 F.3d at 1186.

This Court has noted, in the municipality liability context, deliberate indifference is to be determined according to an "objective standard." (Doc. 34, p. 25). The Tenth Circuit has held, "[i]n the context of municipal liability, deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Johnson v. Davis Cnty*, 2022 U.S. App. LEXIS 7262, *11 (10th Cir. Mar. 21, 2022) (citing *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019)). Regarding this standard, the Tenth Circuit has concluded:

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a 'narrow range of circumstances,' however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction.

*Barney v. Pulsipher*, 143 F.3d 1299, 1307-1308 (10th Cir. 1998).  "One prior incident, even if it was a constitutional violation sufficiently similar to put officials on notice of a problem, does not describe a pattern of violations." *Waller*, 932 F.3d at 1287 (citing *Coffey v. McKinley Cty*., 504 F. App'x 715, 719 (10th Cir. 2012)).

**II.     Turn Key was not deliberately indifferent with respect to Ty Rutledge.**

A. Turn Key maintained a full-time psychiatrist, psychologist, and physician at the Jail during the entire period of Mr. Rutledge's incarceration.

Plaintiff has alleged that Turn Key's Psychiatrist, Dr. Lewis, "was a 'roving' provider, who worked a[t] numerous facilitates [*sic*]. Thus, as a matter of policy and practice, Dr. Lewis was unavailable most of the time to inmates like Mr. Rutledge with serious psychosis in urgent and

11

emergent need of an assessment." (Doc. 3, ¶¶ 76-77). This allegation is the gravamen of Plaintiff's sole remaining claim, and it is indisputably *not true*.

Psychiatrist Dr. Lewis was a full-time employee within the Tulsa County Jail during the entire period of Mr. Rutledge's incarceration. (SUMF, ¶¶ 4-6).  Far from being a "roving provider who worked at numerous facilities," Dr. Lewis worked over 1,000 hours within the Jail from January 2018 through May 2018, and was present within the Tulsa County Jail for approximately 47 hours per week during that time period. (SUMF, ¶ 4).  Psychologist Dr. Irvin was also a full-time employee within the Jail, working over 830 hours during this time period, or 38.5 hours per week, on average. (SUMF, ¶ 5).  Drs. Lemons and Cooper together provided a full-time physician presence within the jail as well. (SUMF, ¶ 6).

Plaintiff's counsel knew that this allegation regarding Dr. Lewis (Doc. 3, ¶¶ 76-77) was not true when it was pled. Plaintiff's counsel deposed Dr. Lewis on May 21, 2021 in another matter against Turn Key.  Dr. Lewis testified that he began working as a psychiatrist for Turn Key within the Tulsa County Jail in December 2016 and further testified as follows:

> Q [Mr. Smolen]: So when you start, tell me what the actual work schedule is like.
>
> A [Dr. Lewis]: 8:00 to 5:00 or 7:00 to 3:00, Monday through Friday. Sometimes I would come in on weekends and catch up extra work.
>                                  …
> Q: How long do you serve in the capacity as just the Tulsa County psychiatrist for the jail there under Turn Key?
>
> A: For – I'm going to say over a year-and-a-half, two years.

(Exh. 11, Excerpts from deposition of Dr. Jawaun Lewis taken by Plaintiff's counsel on May 21, 2021 in *Lee v. Turn Key, et al.*, No. 19-CV-318-GKF, 25:20-26:1; 29:24-30:3; 35:25-36:4). Despite obtaining this sworn testimony from Dr. Lewis in May 2021, Plaintiff's counsel speciously alleged in the present Complaint, which was filed more than six months later (on November 30,

2021), that Dr. Lewis was a "roving" psychiatrist who "worked at numerous facilities" and thus was "unavailable most of the time" to Tulsa County Jail inmates. (Doc. 3, ¶¶ 76-77).

This Court allowed Plaintiff's claim against Turn Key to go forward on the express, narrow finding that the Court could "reasonably infer that Mr. Rutledge was not seen by a mental healthcare professional due to the 'roving' nature of Dr. Lewis's position and his general unavailability." (Doc. 34, p. 28). Moreover, all of Plaintiff's §1983 claims against Turn Key were dismissed, except "to the extent premised on a theory of chronic unavailability of, or lack of access to, an on-site physician or psychiatrist." (Doc. 34, p. 32). The policy allegations underlying Plaintiff's sole remaining claim are simply not true. The indisputable evidence demonstrates that, during the entire duration of Mr. Rutledge's incarceration, there was a full-time psychiatrist, full-time psychologist, and a full-time physician presence on site within the Tulsa County Jail. Turn Key is entitled to summary judgment on this basis alone.

  B.  <u>Mr. Rutledge was regularly seen by Turn Key mental health professionals until the date of his death.</u>

Not only are Plaintiff's policy allegations not true, Plaintiff also knowingly misstates the extent of care provided to Mr. Rutledge. This Court's Order permitting Plaintiff to pursue her remaining §1983 claim also rested upon Plaintiff's allegations that "Mr. Rutledge was not seen by a mental health care provider for over two months" despite submitting ten kiosk requests to Turn Key between March 2, 2018 to May 18, 2018. (Doc. 34, p. 28; Doc. 3, ¶¶ 16, 18-28).

Mr. Rutledge was seen by Dr. Lewis, in person, on March 22, 2018 in direct response to Mr. Rutledge's kiosk requests. (SUMF, ¶ 28). Dr. Lewis assessed Mr. Rutledge, increased his medications, and made plans to follow up with him in 90 days. (*Id*.). Plaintiff wholly omits this visit from her Complaint and, instead, affirmatively alleges that, "[d]espite the complaint of hearing voices, Mr. Rutledge was not seen by the Jail's psychiatrist, and Turn Key employee, Dr.

13

Lewis." (Doc. 3, ¶ 20). Further belying Plaintiff's claims of his "unavailability," Dr. Lewis also continued to adjust Mr. Rutledge's medications in response to Mr. Rutledge's kiosk requests and reports from other Turn Key staff. (SUMF, ¶¶ 30, 31, 33).  Mr. Rutledge was also evaluated seven additional times by mental health providers between March 8, 2018 and his death on May 19, 2018. (SUMF, ¶ 25).  Despite having possession of the medical record for more than a year before filing the Complaint (*see* Exh. 12), Plaintiff included none of these evaluations in her Complaint.

Plaintiff's distorted, and at times outright untruthful, depiction of Ty Rutledge's mental health care within the Jail forms the sole basis for Plaintiff's claim that Mr. Rutledge's constitutional rights had been violated. (Doc. 3, ¶¶ 16, 18-28; Doc. 34, p. 28). The undisputed facts of this case demonstrate that Plaintiff's allegations regarding Ty Rutledge's mental health care are insupportable, and Turn Key is entitled to summary judgment on this basis.

C.   Plaintiff cannot demonstrate that Turn Key was on notice that its policies regarding the care of suicidal inmates were deficient.

As a necessary prerequisite to Plaintiff's §1983 claim, Plaintiff must demonstrate that Turn Key had "actual or constructive notice that its action or failure to act [was] substantially certain to result in a constitutional violation" by "proving the existence of a pattern of tortious conduct." *Barney*, 143 F.3d at 1307-1308. A single prior incident, even if sufficiently similar, is not sufficient to demonstrate such a pattern of conduct. *Waller*, 932 F.3d at 1287.

Plaintiff has alleged that two other inmates within the Jail hanged themselves, resulting in their death by suicide: Caitlin Lewis on October 5, 2016 and Jimmy Ray Williams on July 31, 2017. (Doc. 3, ¶¶ 66, 67; Doc. 34, p. 28). Plaintiff further alleges that, on May 10, 2016, another inmate attempted suicide. (Doc. 3, ¶ 80; Doc. 34, p. 28).

Turn Key did not become the contracted medical care provider at the Jail until December 1, 2016. (SUMF, ¶ 1). As such, only the Jimmy Ray Williams incident could have served to put

14

Turn Key on notice of alleged deficiencies in its care to suicidal inmates. Discovery would provide no aid on this issue, as the Jimmy Ray Williams incident is the only suicide death within the Jail from December 1, 2016 to Mr. Rutledge's death. (SUMF, ¶ 3). As the Tenth Circuit has held numerous times, one prior incident, even if sufficiently similar, is not sufficient to establish a pattern of conduct. *Waller*, 932 F.3d at 1287; *Johnson*, 2022 U.S. App. LEXIS 7262, at \*12-13; *Coffey*, 504 F. App'x at 719.  This is yet another basis upon which Turn Key is entitled to summary judgment on Plaintiff's §1983 claim.

### III.     Turn Key is entitled to its attorneys' fees and costs incurred in connection with this motion pursuant to 28 U.S.C. §1927 and the Court's inherent authority.

Plaintiff's counsel pursued this §1983 action, and overcame dismissal of one claim, by pleading knowingly false allegations. Despite full access to Mr. Rutledge's medical records (*see* Exh. 12), Plaintiff's counsel has not only omitted *every* mental health evaluation provided to Mr. Rutledge during his incarceration, they have falsely alleged that Dr. Lewis did not see Mr. Rutledge after March 17, 2018. (Doc. 3, ¶ 20).  Further, Plaintiff's primary policy allegation, that Dr. Lewis was a "roving" psychiatrist (Doc. 3, ¶ 77), was known by Plaintiff's counsel to be false.  Dr. Lewis had previously testified, in a deposition taken by Plaintiff's counsel, that he was the full-time psychiatrist at the Tulsa County Jail during the period of Mr. Rutledge's incarceration. (*See* Exh. 11).  Lastly, Plaintiff's counsel is keenly aware that Turn Key did not become the medical provider for the Jail until December 2016.  *See, e.g.,* Doc. 146, *Bond v. Regalado*, No. 18-CV-231-GKF (N.D. Okla. Sep. 30, 2021) (Order granting Motion in Limine regarding "hiring of Turn Key Health Clinic in December of 2016").  The Complaint again omits this fact, lest it become clear that only one of the alleged previous suicides within the jail occurred under Turn Key.

Plaintiff was able to avoid dismissal of one claim based on three specific factual allegations within the Complaint, all of which were known by Plaintiff's counsel to be untrue at the time the

Complaint was filed.  This Court and the defendants wasted considerable resources at the dismissal phase analyzing and "accepting as true" these factual allegations for purposes of Rule 12(b)(6) dismissal standards.  Indeed, it appears the Court spent a significant amount of time considering and later reconsidering the legal issues presented (*see, e.g.,* n.1 of Doc. 34) and entered two lengthy and detailed Orders on the motions to dismiss (*see* Doc. 30 (25 pages in length) and Doc. 34 (32 pages in length)).

Title 28, U.S.C. § 1927 provides that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  *See also, Transp. Alliance Bank, Inc. v. Arrow Trucking Co.*, 766 F. Supp. 2d 1188, 1201-1202 (N.D. Okla. Jan. 21, 2011) (Awarding attorney's fees under 28 U.S.C. §1927 where plaintiff "put defendant…to the trouble and expense of extensive motion practice and also required considerable court time and attention" despite being "on notice" that its claim was insupportable.).  In addition, it is well settled in this Circuit that federal district courts have inherent authority "to sanction parties for bad faith conduct in litigation" by awarding attorneys' fees and costs. *See Morganroth & Morganroth v. DeLorean*, 213 F.3d 1301, 1317 (10th Cir. 2000) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)). Moreover, "[o]n its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(B)." Fed. R. Civ. P. 11(c)(3).

Plaintiff's knowingly untruthful allegations in her Complaint have unreasonably multiplied these proceedings, and Turn Key is entitled to its attorneys' fees and costs in defending against Plaintiff's claim.

16

## <u>CONCLUSION</u>

The indisputable evidence establishes that Plaintiff's claim fails as a matter of law.  The Court must accept the Plaintiff's allegations as true at the dismissal stage; however, at summary judgment facts must be viewed in the light most favorable to the nonmoving party "only if there is a 'genuine' dispute as to those facts." *Scott*, 550 U.S. at 380.  There can be no "genuine" dispute as to the plain facts presented herein. Dr. Lewis was not a "roving" psychiatrist. Ty Rutledge did not go unseen for the two months prior to his death. There had been only one prior suicide under Turn Key at the Tulsa County Jail.  The Court has the power to take cognizance of the indisputable evidence in this case and disregard Plaintiff's demonstrably untruthful allegations. Turn Key respectfully requests an Order granting summary judgment in its favor and awarding its attorney fees and costs in defending Plaintiff's claim.

     Respectfully submitted,

/s/ Jo Lynn Jeter
**Jo Lynn Jeter**, OBA #20252
**W. Caleb Jones**, OBA #33541
**NORMAN WOHLGEMUTH**
3200 Mid-Continent Tower
401 S. Boston Ave.
Tulsa, OK  74103
Telephone:  (918) 583-7571
Facsimile:  (918) 584-7846

**ATTORNEYS FOR DEFENDANT,
TURN KEY HEALTH CLINICS, LLC**

17

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that on July 28, 2022, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants (names only are sufficient):

  Daniel E. Smolen
  Robert M. Blakemore

        <u>/s/ Jo Lynn Jeter</u>
        **Jo Lynn Jeter**